First patient on the call is 2-08-0821. This is Doria v. Village of Downers Grove. Outputting on behalf of these patients is Ms. Margaret O'Connell. And outputting on behalf of the faculty is Mrs. Erica Baldonado. Counsel? Good morning. May it please the Court, Counsel? My name is Margaret O'Connell and I represent Richard Doria as the appellant in this matter. We are here today to ask that this Court reverse the ruling of the Circuit Court wherein the Court granted summary judgment in this matter. As this Court is aware, summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. In support of our argument, there are several factors that need to be considered. Most importantly, the evidence that was brought out at the trial court level. There were depositions that were taken in this matter. Mr. Doria testified during his deposition as to how it was that he sustained his injuries. He testified that he parked in this particular gravel lot on several prior occasions. The gravel lot is located adjacent to a UPS store. It's undisputed that the Village of Downers Grove does in fact own this gravel lot. Mr. Doria testified that he had parked in this gravel lot on several occasions to gain access to the UPS store. On the day in question, he went to his trunk to retrieve certain items. He then tripped and sustained his injuries. In addition to Mr. Doria's testimony, there is the testimony of the Village of Downers Grove, the divisional manager for the Department of Public Works, Mr. Ebel. He testified during his deposition that the Village did own and control the sidewalk, the street, and the gravel lot in question. He understood and testified that it was used by patrons to gain access to the UPS store and to other businesses in the area. Also, there is the testimony of two of the Downers Grove police officers, both who were on the scene. Both officers testified that it was legal to park in the gravel lot, so long as the vehicles in question had no other illegal violations to the vehicles. Counsel, doesn't this case really turn on the meaning of whether or not under the statute, the government's case, plaintiff's use, somebody in the situation of your client, whether the Village intended that kind of use of the lot? Yes. Where is it in the record that establishes the Village intended that the lot be used in that manner? Well, it is our position that the testimony that I was speaking of, coupled with the historical use of the gravel lot, which I do cite to and argue in my brief, all support the proposition that Mr. Doria was, in fact, an intended user of the gravel lot and that the Village reasonably should have expected and contemplated that the operation, that anyone who parked their vehicle in this gravel lot would obviously have to use the area around the vehicle to gain access. And therefore, they had a duty to maintain the gravel lot. So it's not paid, as I understand it. Correct. It's not maintained by the Village. There's a parking bumper, as I understand it, from the facts that no one seems to be able to definitively state how and where or when it got there. Correct. So it's not paid. It's not maintained by the Village. So how does the historical use then make it proper for the Village to be obligated to maintain it? Well, the testimony of Mr. Ebel was that they did maintain the sidewalk, the street, and two feet from Washington Street over. So there is a portion of this lot that they do in taking Mr. Ebel's deposition testimony into account that they do maintain. So the question then becomes whether or not, given the history and the fact that this gravel lot has historically been used for patrons to gain access to the UPS store and to other businesses, whether or not they should have contemplated that they had a duty to maintain this property. I mean, it is their property. So basically what you're saying is historical use can sort of then make it the intended purpose of the Village. So somehow the historical use of the Village does nothing but observe this and somehow it becomes the intended use? The historical use is one of the factors that needs to be taken into consideration. It's certainly the historical use of the gravel lot as testified to during the deposition weighs in favor of finding that Mr. Doria was in fact an intended user when he went to park his car in this gravel lot in order to gain access to the UPS store, as other patrons have in the past. We believe that this is a compelling factor in conjunction with the other evidence that the lot was intended for use as a parking lot and therefore there is a material issue that is disputed here and that summary judgment was improperly granted. The historical use in the case law seems to go, I mean, the Supreme Court case is kind of both ways. I mean, sometimes they say it's important, sometimes they say it's not important. I mean, Marshall is important in this case, it doesn't seem to be as important. All the cases talk about the nature of the property itself as being really the crux of what we're talking about.  Other than the historical use, it shows that this was intended by the city to be used as parking for people who are not used also. Well, I think the most, to answer that question most directly, is the fact that there were no signs that prohibited parking there. Certainly the village has owned this property for some period of time. If they didn't want people to park there, they could very easily have just put up signs saying that no one could park there. Well, that's kind of like the permitted use, and again, permitted use and intended use are two totally different things. If it's intended, it's certainly permitted. If it's permitted, it doesn't necessarily mean it's intended. Correct? Yes. All right. So, I mean, the fact that it's legal to park there and there are no signs, I mean, that gets back to the cases of the people riding bikes down the streets. I mean, it's legal to ride your bike down the street, but all the cases say the street wasn't meant for bikes. Correct. So, you know, how does the fact that there's no signs there, which goes, in my opinion, maybe more permitted use, go to intended use? I think you have to look at, most importantly, the top, I'm sorry, the deposition of Mr. Ebel, where he talks about the duration of time that they've owned this lot, that they knew that this was going on. I think that their non-action at some point has to trigger that they intended this to happen. They knew that it was happening, and they chose not to do anything about it. As Justice Hudson spoke of, as far as the barrier that's there, they chose not to remove that either. So I think that it's not one factor in this case that makes it a permitted use, but it's all of those factors taken together that require this case to be remanded back and that the granting of summary judgment was, in fact, in error. Was the bumper on the city property? It is on the city property. The one picture that's in the brief was in the record. The one picture that showed the bumper was in the record, right? Yes. And that's right up next to the wall? Yes. Was it on the city property? I believe it was. Counsel, just getting back to the distinction my colleague has drawn here, that the case law does draw between permitted and intended, give me an example. Explain to me how this property that we're dealing with here, how could it ever be permitted but not intended? I mean, given what you're saying, well, the fact they did not put signs up prohibiting it, they owned it for a while, they knew people were using it, all of those things unquestionably support the idea that it was permitted. So if those things are sufficient to rise to the level of intended, then tell me what the city would have done differently or could have done differently so that this property would be only permitted use, not intended use? So if I understand your question correctly, what actions would the village have had to take in order to? To still permit parking there but not to intend it. To permit parking but not intend parking to be there. Right. I don't know that I can answer that question because it comes, in my mind, it comes back to the signage issue. If they did not intend for this property to be used as a parking lot, they could have simply erected a sign that said no parking. That would have gone more further than what I'm asking because that would have made it no longer permitted either. Okay. So I'm trying to figure out, and this distinction between permitted and intended is not something that I find intuitively making sense to me, but it's in the case law, we have to deal with it, and I think you're right to recognize it's there. All right. Then to answer your question, I believe they could have somehow denied access off of Washington Street to this gravel lot. They could have put up, they could have roped it off, they could have taken the barrier that we've spoken of and put that on the outside so that people could not have gained access to it. They could have somehow limited the access of automobiles to this lot if they intended for people not to park there, absent, obviously, the signage issue. But again, those actions you speak of would also not permit them to park there either. Correct. So I'm trying to figure out what they could do to permit them to park there but not intend for them to park there. I don't know that I can answer that question as I stand here right now. Okay. Counsel, as a corollary of what Justice O'Malley was asking you, you apparently seem to be engrafting this element that if the village knows, and this could happen in any area, that people are using an area for parking and the village really doesn't do anything, somehow they then have an affirmative obligation to do something or it transmutes from a permitted into an intended. Is there a case law that supports it other than the historical use? And I think that's a little bit different in the cases that are cited. They talk about the custom of motorists using paved roads for street parking. It's a historical thing. And obviously, you can't have ingress and egress to your cars if you can't walk on the sidewalk adjacent to the paved road. But this is different. This is a lot that anybody could start using for parking. And then where is the obligation of the village to affirmatively do something to prevent it from becoming an intended use in the absence of any affirmative evidence that they are intending to allow this to be used for parking? Well, I did cite to the D Dimencio case, which I think is instructive to some extent as to answer your question regarding whether or not the village would be expected to contemplate and intend that the operator of the vehicle in the parking lot would use the area around the parking lot. So that case does speak to that ultimate issue. And I think that that case is somewhat instructive to your question, Your Honor. Well, I think, again, that gets into parking on a paved street where the possessions have ingress and egress from their parked cars. But you don't have any case law, do you, that supports the fact that the village, under some circumstances, and it may be a question to ask the proposal counsel, develops an affirmative obligation to do something when they stand by and watch this property being used? You don't have any specific case law? I do not. And I have nothing cited in my brief to that extent. Are there any cases that talk about the historical use of a particular piece of property? Because the cases that talk about historical use, it's kind of in general like the use of streets by bicyclists, such as this particular street or the use of parkways for people to walk at and things like that. Are there any cases out there that say, well, we're going to look at the historical and customary use, I guess it would be more historical use, of this particular piece of property? I did research that issue. I did not find any that were on point or that would be, I thought, to be useful in this argument. Thank you for your time. Thank you. Counsel for the village of Downers Grove. Good morning, Your Honors. My name is Erica Baldinado and I represent Downers Grove in this case. I think the panel has concisely narrowed the issue as to whether or not Mr. Doria was an intended user of that narrow gravel strip of land adjacent to the UPS store. And I think Illinois law is very clear that there are a number of things that we can look at to determine the intended use of property. The first thing is, are there physical manifestations on the property itself which would hold it out to particular use? In this case, in the photograph that we've attached to our brief, this gravel strip of land is conspicuously void of any use. Before you go there, they objected, I guess, that you have one record, one photo that's in the record, and then another photo that they're claiming in a drawing that are not part of the record? What's your response to that? My response is both photographs are in the record and they're cited to the location in the record. It is there. C. The first photograph of the gravel lot, which is on our brief, page 1B, is located at page C53 of the record. The second photograph, which is what I think they object to, is an aerial view of the gravel strip of land located on page 3A of our brief, and that's actually located in the record at C172. So both of those are clearly in the record. That's where they're obtained. They do object to the diagram 1A, too, I thought. We are not contending that it was part of the record that was merely inserted into our brief as a visual aid or demonstrative aid for the court to see exactly how. It was an aid for this court, us here, not for the trial court. Yes. Yes, this was not included in the record, and we don't contend that it was in the record. It was merely computer-generated to act as a visual tool for this court. Okay, is that permissible? I mean, to show that we're merely in there, I don't – I mean, you can't – you're creating a visual aid for us that was not part of the visual aid available to the trial court. Their position is that's not permissible. It strikes me that they're right. Okay. I mean, we cannot consider evidence of whether it was in the trial court. We don't understand that. I understand that, and we're not contending that it's actual evidence. Again, we inserted it as a visual tool. And if the panel deems it improper, then we would ask you to not consider it, but certainly please consider the photographs that were part of the record. Okay. Go ahead. Okay. So I think there are a number of things that the court could look to to determine the intent of a particular piece of property. I think you're – you've fixed all of the elements, but you raised – your opponent raised an interesting question. In this context, suppose you can argue that the property began being used as a parking lot. I believe there's evidence that the village, by and through its employees and agents, became aware of the fact or some acknowledgement that it was being used as a parking lot. And if you have a case that that is going on for a period of time and the village doesn't do anything, doesn't put up no parking signs, doesn't let – just allows it to continue to be used by the citizens in this manner, is that a consideration that enters into the mix here? Does the village have any obligation to do something if they see the property being used for something other than an intended use? No. The village does not have an obligation to do anything. And I think the – You're saying as a matter of law they do not have an obligation. Well, I think Illinois case law supports the fact that there is no affirmative duty on the part of the village to erect signage on every single piece of property that it's conceivable that a car could possibly park. I mean, imagine if I'm issuing –  piece of property. And the question was they'd have an obligation to put it on a particular piece of property that they are fully aware of over a number of years as being used as a parking lot on a regular basis. So the answer that they don't have an obligation to do it on every piece of property I think avoids this question. We're all – they can't do it on every – don't have to do it on every piece of property. But the question is if you have a place that there's no dispute this is historically used as a parking lot, at some point does it ever rise to the level where historic use and the village's awareness of it brings about the duty? And my answer would still be no, respectfully. I think the Britton case by the 2nd District speaks to that issue directly as well as the Khalil case. In Britton that was the case where a 12-year-old was motorbiking over public property where it was known by the police officers who never issued tickets that young males were motorbiking over this property. It was known that the village had dumped large piles of dirt on this property, that the village was aware that motorbiking was going on and that nothing affirmatively was done by the village. And in that case the 2nd District found that even extensive frequent permissive use is not tantamount to intended use. That there was no duty on the part of the village to erect signage or to prohibit motorbiking even though there was absolute knowledge that it was going on. And I think the Khalil case, which is a 1st District case, which involved a pedestrian walking in the middle of an alley who had fallen into a hole, also speaks to that issue. And in Khalil the court specifically found that frequent permissive use of the alley by pedestrians does not convert that alley into intended use by the city. Was the motorbiking illegal? No. I thought I read somewhere in the record. Was it permissible? Was it a violation of some ordinance to allow the parking lot to be used in this manner? The parking lot or the dirt roads that you're talking about? The parking lot in this case. Oh, in this case. Was it an ordinance violation to be doing that? No. It was not? In this case, no. The police officer indicated in the record that he did not routinely issue tickets for cars that were parked there. But could it have been a violation of an ordinance? It could have been if the car was parked in such a way that it either obstructed the sidewalk or the street. And I think the evidence is clear that Mr. Doria had to actually park his car at a 30-degree angle because this gravel strip was so narrow that if he didn't park it at this angle, his car would necessarily either obstruct the sidewalk or the street. And I think the photograph in this case speaks volumes for the lack of intent of Downers Grove to hold this out as a parking lot. We are talking about a very narrow gravel strip of land. And if you look at the overhead aerial view of the same property, immediately across the street from Washington, you can see how the village holds out property that is intended to be used as parking. That's actually on page 3A of our brief. If you look at that photograph, which is an aerial view, you can see that immediately across from Washington Street, there is a paved area with parking lines, which is village owned. So you can see the stark contrast between these two pieces of property. In addition to the physical indicators or lack thereof on the property at issue, you have the direct testimonial evidence of both Richard Ebel and Dorin Farah, who speak directly to the issue of the lack of intent by Downers Grove to use this property as a public parking lot. And the testimony was clear that had they ever intended this property to be used as a parking lot, it would have been upgraded to asphalt, it would have been striped, there would have been meters, or there would have been signage. We realize it's the intent of the city for the building to be controlled. The question with this customary use seems to be the time of the formation of the intent. Do we look to the beginning of when this lot was bought by the city or whatever for the time of the formation of the city's intent? Or can the city's intent change over time based upon customary use? I certainly think the city's intent can change over time. I think in this case, Dorin Farah testified that for the past 15 years that he's held the position as engineer, that lot has remained in the exact same state. In the 15 years that he's been the engineer, it's never been intended to be used as a public parking lot. So the intent, you're saying the intent would not change over, because of customary use. They intended it not be allowed, they were aware it was being used all the time as a lot, but their intent never changed. Exactly, their intent did not change. Now certainly if their intent changed and they upgraded it to asphalt, then that would be another issue. But again, our argument is that no amount of permissive use, no amount of customary use can convert it into an intended use unless the municipality changes that intent. Counsel, did you carry any cases that talk about the timing of the formation of the intent? I did not come across any cases that indicated that. On the issue of historical use, the opposing counsel cited the DiDomenico case as authority to support her argument. How do you distinguish the effects of that case from this case? Well, I think DiDomenico, like a lot of the cases that were cited by the plaintiff, really is distinguishable based on the location of where the car was. In DiDomenico, we're talking about a car that was legally parked on the street in a position that the village intended to be used as parking. In this case, we're talking about a narrow gravel strip of land that plaintiff chose to park in because it was a shortcut to access the UPS store. So I think DiDomenico is distinguishable on its face based on the fact that we are again talking about street parking, which is customarily used for public parking. So you were saying a moment ago that the permissiveness won't change the situation unless the village's intent changes, if we establish it. But her position, of course, is that that's the question of fact here. How can we determine in a summary like this that there's no question of fact as to whether or not the village's intent, even assuming it didn't intend it to begin with, after a lengthy period of time and an awareness, how do we know that the fact that the village's intent didn't change? Well, I think the affidavit of Doran Farah and, again, Richard Ebel, not only speak to their intent in the past but currently. In fact, I think the testimony both in the affidavit and in the deposition was that it was never intended. It is not intended to be used. So I think from that testimony it is crystal clear that the intent has not changed. It's not a question of fact merely because a plaintiff would like it to change. There is no testimony in the record. There's no evidence in the record that it ever changed. And there was no testimony in the record that they anticipate it's going to change. So I think that removes the issue from being a question of fact. As a practical matter, though, what's troublesome is how would you ever ascertain the village's intent changed absent an affirmative, clear statement by them? So, theoretically, people could be parking in this lot for 50 years, put up bumpers, cars are there, the police see it, go there, and then you would defend on the basis, we never issue a definitive statement, a public statement that our intent changed. Can't you infer, as you do in other contexts, intent by the circumstances? How could anyone ever practically prove the intent changed is my question. Well, I think that goes to looking at the physical manifestations of the property. You can see that their intent changed when they've upgraded the lot to asphalt, when they've installed parking bumpers, parking meters. You're saying that something else that happens there, the use of the property, can never be a factor in determining the village's intent. I think use only comes into play if the village's intent is unknown. I think in this case the village's intent is very well known via affidavit and via testimony. I think in the customary cases that counsel cited to, we were talking about Marshall with the parkway, which it was unclear what the intent was. So they looked at the historical use of a parkway, because there was no concise statement by the village what the purpose of the parkway was. So in that case they looked at customary or historical use. In this case you have evidence from the village engineer and from Richard Eagle, the assistant engineer, regarding the intended or lack of intended use of that parking lot. So I think it takes away any consideration of customary use because you have direct evidence. Do you think the parkway case would have been decided differently by the Supreme Court if in fact the city had come out and said we never intended people to walk on parkways? I don't know. Because, I mean, basically what you're saying is because we say so, it is. And, I mean, really, isn't that a question of fact? That certainly the fact that the city says we have never intended this to be a parking lot, but now we have all these other things going on and it's been used as a parking lot. I mean, is that a question of fact or not? And, again, I know you're stating this since the city has made this definitive statement, but we can't look past that definitive statement. Well, I don't think the law allows us to. I think the Supreme Court cases say that it is the village's intent which controls despite customary use. That's true. I mean, it's the village's intent that controls, not the user's intent on that. We understand that. But you're talking about the village basically saying in any situation this is what our intent is, everybody has to live with it. I don't know that we have to live with it. There's other evidence out there to show that that wasn't the intent. Well, I think that's a good point, but I think that would be up to our legislature then to change the wording of 3102A, which clearly says that it has to be the intended use of the village. I just have one closing remark, if that's okay. Yeah, go ahead. I think it's important to look at the practical effect of what would happen if this case was decided contrary to the trial court's ruling. I think it's very multifaceted. I think if we were to require prohibitory signs on every piece of property that customarily was used for something other than the intended use, it would be a huge financial drain on municipalities. I think it would require villages to put up signs in vacant lots or unimproved gravel strips. And if we didn't do that, I think it would allow motorists to park their cars anywhere that there wasn't a prohibitory sign. So you would have cars parking in forest preserves or in vacant lots or on the side of a public school athletic field to watch games. And I think that it could really have damaging effects both to villages and their resources and to what could happen in our community if we allowed cars to park where they thought it was fine because there were no prohibitory signs. What was it that the House prohibitive argument specifically raised and rejected in Marshall? I think Marshall has been tempered. I think just drawing on our own common sense and experience, I think clearly the requirement of having villages install prohibitory signs throughout their towns in every single place or every single piece of land where it's conceivable somebody can park would certainly be a financial drain. Thank you, Counsel. Thank you. And followed by you. In addressing the question last asked regarding how it would be cost prohibitive to put up signage, the other thing that a municipality could do if they really did not intend for this area to be used as parking would be they could pass an ordinance stating that only in paved, striped parking lots is where vehicles can park their vehicles lawfully. And then anyone who parked in an area that was not prescribed or defined by that ordinance would be found to be in violation of that ordinance. So I think that there are other actions that the village could have taken. The only other thing that I would state, and it's argued in my brief, is just that there was an objection at the trial court level, certainly we renewed it here, regarding the affidavit of Doran Farah and that it did not comply with Supreme Court rules. Based upon that and the arguments in my brief, I do ask that this court remand this case back and reverse the finding of further granting of summary judgment. Thank you. All right, well thank you both for your arguments. The court will take the matter under advisement.